UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 04-10039-PBS |
| v. ) |  |
| WENDY C. DINKINS ) |  |

### UNITED STATES' SENTENCING MEMORANDUM

The government submits this memo to address a sentencing issue that has arisen since the time the parties submitted their versions of the offense to the Probation Department and since the PSR was prepared – that is, the government's request that the Court impose a two-level enhancement for obstruction of justice (under U.S.S.G. § 3C1.1) based on what the government believes is the defendant's attempt to falsely implicate others in the scheme to which she has pled guilty.

### THE FACTS

A.  The plea

Wendy Dinkins pled guilty, without a plea agreement, on January 12, 2005, to one count of an 11-count mail fraud indictment. Because of questions about the mailing element of the other ten counts, the government has agreed to dismiss them after Dinkins' sentencing, which is scheduled for July 7, 2005.

B.  The Fraud Scheme

Between May, 2000, and April, 2001, Wendy Dinkins, an EquiServe customer service representative, executed a scheme to defraud a series of EquiServe customers out of more than $130,000. She began by changing the customers' mailing addresses to her own. Then,

posing as the customer, Dinkins requested that EquiServe sell the customer's shares. After it complied with these requests, EquiServe issued checks for the proceeds, which Dinkins took for herself. Dinkins then forged the customers' signature on these checks and deposited them in her personal bank account. To reduce the chance that her bank would refuse the checks, Dinkins chose as victims EquiServe customers whose names were close to that of her son, with whom she shared the bank account. In less than a year, Dinkins received and cashed sixteen checks in the name of six customers, totaling approximately $134,000.

    C.    <u>Dinkins' belated attempt at cooperation</u>

Postal Inspector June Foley, who is the case agent, initially attempted to interview Dinkins about her fraud scheme in December, 2002. Dinkins, however, said very little before telling Foley that she wanted to speak to an attorney. She did not contact Inspector Foley again, nor did any attorney acting on her behalf. Dinkins was indicted on February 11, 2004. It was not until August, 2004, however, when, in the context of plea negotiations, Dinkins indicated to the government, through counsel, that she was interested in providing information about other participants in her scheme. Although there was no plea agreement, Dinkins counsel and the prosecutor discussed the possibility that, if Dinkins' information was helpful to the government, the prosecutor would consider recommending that the government file a § 5K1.1 motion for downward departure.

On September 29, 2005, Dinkins, along with defense counsel, met with the case agent and the prosecutor. During this proffer session, she admitted to taking money from EquiServe customer accounts but claimed she simply joined a group of employees who were executing an ongoing fraud scheme. Dinkins stated that the group had been taking customer

money for two years before she was employed at EquiServe and continued after her termination. As is described in more detail in Inspector Foley's June 22, 2005 report (Attached), Dinkins claimed that there were six people in the group, who she was able to identify only by their first names and some general descriptions.

Dinkins explained that the two EquiServe supervisors who participated in the fraud would instruct the group on how to choose accounts from which to steal. These instructions included looking for dormant accounts and account holders with names similar to her own or family members' names. She further offered that the supervisors told her to look for out-of-state and older account holders and told her that they had to approve the accounts she identified before she was allowed to begin taking the customer funds. Once the supervisors approved an account, Dinkins said, she would put in a change of address, request that the shares in the account be sold, pick up the check for the proceeds from the mail room, deposit it into her bank account, withdraw the money as cash, and bring it back to her supervisor. Dinkins said that she was allowed to keep one-third of the fraud proceeds, with the remainder being divided amongst the rest of the group. Finally, she said that the group had weekly meetings, during which each group member's bank statements would be examined.

D.   The investigation into Dinkins' allegations

Because Dinkins' story appeared, on its face, to be credible (although sparse on identifying details about the co-conspirators) Inspector Foley undertook an extensive investigation in an effort to confirm the allegations. She first asked EquiServe to search its records to (1) determine if customers, other than those whose accounts Dinkins had targeted, had complained about missing funds; (2) identify Dinkins's alleged co-conspirators; and (3)

3

determine whether any customers' addresses had been changed to match those of the alleged co-conspirators.

EquiServe found that it had no customer complaints similar to the ones that triggered the Dinkins investigation, a fact that began to create concern about the veracity of Dinkins's story. EquiServe's attempts to identify the co-conspirators generated likely matches for four of the six employees whose first names she provided.[1]  But the company's records also showed that none of these employees had changed customer addresses to match their own address, as Dinkins had done. Nonetheless, when the case agent showed Dinkins RMV photos of these four employees, she identified them as the people who participated in the scheme.

Inspector Foley then obtained and reviewed the bank records for accounts held by these four individuals, but she found no large or unexplained deposits of the kind that were prevalent in Dinkins's accounts. Inspector Foley next interviewed three of these four people, and all denied any knowledge of, or involvement in, the scheme to steal customer funds.

Finally, Inspector Foley reviewed EquiServe's records of Dinkins' attendance, which revealed a pattern of attendance entirely inconsistent with her claim that she attended weekly meetings with her co-conspirators.   Dinkins' pattern was to take money from a customer account and then go out on disability or other leave for an extended period of time, then return to work, take money from another customer account, and go out on leave again. From March, 2000 to November, 2000 Dinkins only worked a total of seven weeks. She therefore

---

[1] To protect their identities, the attached report has been redacted to list only initials for these people.

was not at work often enough to attend any kind of weekly meetings.

For all of the above reasons, the government has concluded that Dinkins's claim that she was part of a group of employees stealing money from EquiServe customer accounts is simply not true.

## THE GUIDELINES

The government agrees with the Guidelines calculations for the underlying fraud set out in PSR paragraphs 24-31.

But because Dinkins lied to the government, falsely implicating others in her fraud, in an effort to reduce her sentence, the Court should apply the two-point enhancement under U.S.S.G. § 3C1.1 for obstruction of justice. That sections provides for a two-level enhancement if "(A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct . . . ." Note 4(g) to § 3C1.1 states that Courts should apply the enhancement if a defendant made "a material false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." In United States v. Thomas, 86 F.3d 263, 264 (1st Cir. 1996), the First Circuit addressed the breadth of conduct that can trigger this enhancement, holding that the obstruction of justice enhancement should be triggered not just by conduct that impeded the investigation of the crime alleged in the indictment, but also by false statements a defendant made during a bail hearing.

The Court should apply the obstruction enhancement here because Dinkins's false

5

statements: (1) wrongly implicated others in her criminal conduct; (2) were intended to benefit Dinkins at sentencing; and (3) caused the case agent to waste a significant amount of time investigating the bogus leads Dinkins provided.  It is important that courts apply the enhancement in this kind of situation, because to do otherwise would send a message to defendants that they have nothing to lose by wrongly pointing a finger at others in an effort to reduce their own sentence.

        Respectfully submitted,

        MICHAEL J. SULLIVAN
        United States Attorney

By:   /s/ Adam J. Bookbinder
        Adam J. Bookbinder
        Assistant U.S. Attorney

Date:  July 1, 2005