

UNITED STATES POSTAL INSPECTION SERVICE

BOSTON DIVISION

June 22, 2005

REPORT OF INVESTIGATION INTO WENDY DINKINS' CLAIMS

On September 29, 2004, during a proffer session with Wendy Dinkins, Dinkins admitted that while she was employed as a Customer Service Representative at Equiserve in Canton, MA she participated in a scheme in which she targeted dormant client accounts and diverted funds from those accounts and converted those funds for personal use. Dinkins claims she was merely one member of a group of Equiserve employees who had been converting funds for personal use from the dormant accounts. Dinkins claims the group had been operating at Equiserve prior to her employment at Equiserve and she had been recruited into the group shortly after being hired.

Dinkins said another employee named W. asked her if she was interested in making extra money. Dinkins said W. had a Cape Verdian sounding last name. She said her floor manager named R. and a supervisor and training class instructor named K. asked questions regarding her feelings about Equiserve and about the stock market. According to Dinkins, she and another new employee from Revere, who Dinkins described only as a white male in his mid-twenties, were the only two people taken from the training class to work on Exxon accounts on the floor and ultimately to become part of the group. She said they were chosen in large part because they both had prior criminal histories. Dinkins also claimed a person named M. who worked in the mailroom was also part of the group. Dinkins said the only addition to the group after she joined was a woman named N. who had been a prior employee at Equiserve, but had not previously been a participant in the scheme. Dinkins said N. lived in Brockton. Dinkins did not provide a single group member's full name and in one example, she was even not able to provide a first name.

Dinkins explained group members held meetings approximately once per week. She said group members verified each other's activities and brought their bank statements for all to examine. Dinkins said sometimes R. would give you an envelope filled with cash at meetings. Dinkins also said R. would also walk by her work station and leave an envelope that contained cash. Dinkins said R. instructed her how to open an investment club account at Fleet Bank. Dinkins said attempted to open such an account at the Fleet Branch on Tremont Street in Boston but was unsuccessful. Dinkins said other group members had also been unsuccessful in opening this type of account.

On September 30, 2004, I met with Equiserve security and management personnel to brief them regarding the information offered by Dinkins on the previous day. I tasked Equiserve with searching personnel records, time records, client databases, and complaints from dormant accounts similar to the complaints

initiating the investigation into Dinkins' activities. I learned mailroom employees at Equiserve were temporary employees of company in Westwood known as OTS. Deardan reports no other known client complaints regarding account tampering similar to those client complaints precipitating the Dinkins investigation.

During the following weeks I had ongoing conversations with Equiserve Security Investigator Dan Deardan attempting to identify alleged co-conspirators. We examined service dates, work locations, and conducted name searches for all potential co-conspirators. Some results were yielded, including multiple R.s - R.S., R.C.I, R.F., but no results for N. or the "guy from Revere." I tasked Deardan with cross referencing these results with payroll/time records and addresses of client accounts. Deardan informs me R.S. was a supervisor when Dinkins' began her employment at Equiserve, but R.S. left Equiserve in November of 2000. W.G. left Equiserve in November of 1999. Deardan says R.C. did not begin his employment at Equiserve until March of 2001. Deardan informed R.F. was not employed as a supervisor. We did identify K.S. as one of Dinkins' supervisors.

Equiserve Investigator Dan Deardan provides service dates for the following employees:
      R.C. began his employment on 3/12/01 and is a current employee.
      A.F. began her employment on 8/04/97 and is a current employee.
      K.S. worked from 3/24/97 until 11/06/01.
      W.G. worked from 6/22/98 until 11/12/99.
      R. F. worked from 6/28/99 until 12/26/01.
      M.S. worked from 8/21/00 until 12/01/00.

Deardan also checks with negative results whether any known addresses associated with potential co-conspirators were in Equiserve's account holder or change of address databases. Deardan informs me he spoke with a mailroom employee who had been employed since 2002 and does not recall a M. ever working at the mailroom. Deardan says he cannot locate any M. who has worked at the mailroom prior to 2002.

I requested a Financial Crimes Enforcement Network (FinCen) search on K.S. and R.S.. A FinCen search can assist in locating hidden assets as well as coordinate with other law enforcement investigations. No useful information was obtained. I conducted numerous Auto Track searches of potential suspects over a variety of dates and times. I also conducted Registry of Motor Vehicle (RMV) database searches via first name, town, age, addresses, etc. I tasked Equiserve personnel with cross referencing these results with their personnel records. I also cross referenced RMV results with Auto Track and then conducted additional Auto Track searches.

I requested the assistance of a Massachusetts State Trooper in order to obtain RMV photos of potential co-conspirators. The trooper contacted the RMV compliance unit and requested seven driver's license images. Further MSP assistance was necessary to print these photos. I contacted the Providence, RI Postal Inspector's office and requested assistance in obtaining a Rhode Island

Department of Motor Vehicles driver's license photo of one other potential co-conspirator. The Providence office contacted RI DMV who then forwarded to me the requested photo.

On December 1, 2004, I met with Dinkins to identify co-conspirators. I showed Dinkins several Massachusetts driver's license photos and one Rhode Island driver's license photo. Dinkins named K.S., A.F., W.G., R. F., and M.S. as co-conspirators in the scheme. She initially identified the photo of R.C. and said, "That's R.." She then corrected herself and said it was not R. and the photo only looks like R.. She said R. is tall, about 6'2", stalky, blonde and is in his late 30's (Although during the September proffer session Dinkins had previously described R. as in his early thirties). She said he has an Irish name like Flynn. She said his hair is short and has grooves in it.

I ran criminal histories of all named co-conspirators. I conducted address checks with local post offices for R.F., K.S., R.C., A.F., and W.G.. I contacted the National Check Protection Service to determine location of bank records of named participants during the time period between 1999 and 2001. I was informed W. W.G. had a Fleet account; R.F. had a Brockton Credit Union and an Abington Savings Bank account; A.F., K.S., and R.C. each had a Citizen's Bank accounts.

I contacted Fleet/Bank of America investigator and inquire about a stock club. The investigator suggested Quick & Riley as a possibility, but was unaware of any promotion that could fit the profile described by Dinkins. I asked about bank records of W.G. and was informed records are archived and would have to be ordered. I contacted a Citizen's investigator concerning bank records for the period of 1999 through 2001 and was informed these records are archived and would have to be ordered. I contacted Brockton Credit Union/Harbor One Credit Union regarding the records for R.F. and found those records are archived.

On December 13, 2004, Trooper Linda Marlowe and I met with W.G. who denied any and all involvement in a fraud conspiracy at Equiserve. W.G. said she was made aware of dormant accounts at her initial training session, but had never subsequently heard or participated in any conversation regarding such accounts while employed at Equiserve. W.G. stated she received only her salary at Equiserve that she described as very low. She said she lived accordingly and does not have nor has she ever obtained any ill gotten funds from her employment at Equiserve. W.G. said her boss at Equiserve was Mike Troupe and one other woman whose name she could not recall. W.G. said she left her employment at Equiserve because she had been involved in an accident and had exhausted her leave.

Trooper Marlowe and I attempted to interview R.F. at his Easton, MA residence, but R.F. was unavailable. We then visit the local post office and find the address is still good.

I received information K.S. was employed at First Data Corporation on State Street in Quincy. Trooper Marlowe and I went to the State Street facility and, after

speaking with Security and Human Resource personnel, an in house attorney informs us there is no record of K.S. ever employed there.

A check with the Postal Service revealed K.S. had moved from her address listed with the RMV. I went to K.S.'s new address and spoke with K.S.'s husband. He informed me K.S. was working and does not often return home before 8pm. I left my contact number and K.S. called me within an hour. She agreed to meet with me on the following morning.

Inspector Paul Chisholm and I met with K.S. at her office located at First Data Corporation at Crown Colony in Quincy. K.S. adamantly denied all involvement with any fraud scheme. K.S. said she would be willing to produce her bank records and would submit to a polygraph examination. I informed K.S. her records would be obtained via subpoena to which K.S. stated she was pleased and wanted me to look at her bank records so that I could see for myself that she did not have any money. She said she did not know anyone at Equiserve named R. other than R.C. who was a supervisor at Equiserve. She said she was aware Dinkins had taken client funds because she saw an article in the newspaper and she still keeps in touch with people at Equiserve. She said she left Equiserve when she was laid off due to stock market declines after September 11, 2001.

Trooper Marlowe and I twice attempted to interview A.F. at Equiserve but due to unforeseen circumstances, A.F. was unavailable. When Investigative Analyst Sarah Wininger and I interviewed A.F., she appeared both nervous and agitated. A.F. said a representative from Human Resources asked her to come with him and she said that always means that the employee will be fired. A.F. said she is a good employee, has two children, and is committed to a career at Equiserve. She said she was very worried that she was getting fired when she had not done anything wrong. I explained to her the purpose of our interview was she has been named as a co-conspirator in a scheme to defraud Equiserve clients. A.F. appeared to relax and denied participating in such a scheme adding she would never participate in any such scheme. She reiterated she is a good employee and would never risk her job by doing anything wrong. A.F. said there is nothing in her bank records other than legitimately earned funds.

The bank records of named co-conspirators A.F., R.F., W.G., and K.S. were obtained via subpoena. I reviewed those records and found no unusual bank activity and no large or unexplained deposits. Conversely, an examination of Dinkins' bank records at University Credit Union and Metropolitan Credit Union for the period between January 2000 and February of 2002 revealed multiple large check deposits totaling $133,997.16 that were all traced to Equiserve client funds. Once these checks were deposited, the funds were soon after depleted via wire transfers and subsequent cash and check withdrawals. While Dinkins claimed, as an internal control to the scheme, her co-conspirators at weekly meetings reviewed each other's bank statements, no unusual banking activity was found on named co-conspirators' bank records.

Furthermore, once Dinkins began tampering with client accounts, Dinkins set an attendance pattern when, soon after tampering with accounts, Dinkins would be out of work for extended periods. She would return to work for a short period of time, tamper with an account, and then again leave work for an extended period. From March of 2000 until the beginning of November of 2000, Dinkins worked a total of seven weeks. Although Dinkins claimed to have attended weekly meetings, she did not attend work often enough to attend these meetings.

After following multiple leads into Dinkins' claims of a conspiracy at Equiserve, I found no evidence to support her claim. Dinkins estimated her co-conspirators tampered with forty accounts. I contacted several clients whose account funds had been diverted by Dinkins. All informed me they realized there were problems when they had not yet received their end of year tax statements. While four of the seven clients whose accounts Dinkins depleted eventually notified Equiserve officials, Equiserve has received no such client complaints regarding any other accounts. No further attention is warranted into the investigation of alleged co-conspirators named by Dinkins.

Respectfully submitted,


June M. Foley
US Postal Inspector
US Postal Inspection Service
495 Summer Street, Suite 600
Boston, MA 02210
(617) 556-0406